## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

WANDA MARTIN,                          :

      Plaintiff,                   :

                                                      Case No. 3:07CV00268

 vs.                                   :

                                                      District Judge Walter H. Rice

MICHAEL J. ASTRUE,                     :    Magistrate Judge Sharon L. Ovington
      Commissioner of the Social
      Security Administration,         :

      Defendant.                      :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.      INTRODUCTION

Plaintiff Wanda Martin suffers from limited mental abilities, high blood pressure, hypothyroidism, dizziness, falling and heartburn. (Doc #7 at 1). She has no prior work history. Claiming to be disabled by her multiple medical and psychological problems, she sought financial assistance from the Social Security Administration by applying for supplemental security income ["SSI"] with a protective filing date of February 9, 2002.

After various administrative proceedings, Administrative Law Judge ["ALJ"] David A. Redmond denied Plaintiff's SSI application based on his conclusion that

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (Tr. 27).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #6), the Commissioner's Memorandum in Opposition (Doc. #7), the administrative record, and the record as a whole.

Plaintiff seeks a remand of this case to the Social Security Administration to correct certain alleged errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.  FACTUAL BACKGROUND

At the time of the ALJ's decision, Plaintiff's age (56) placed her in the category of a "person of advanced age" for purposes of resolving her SSI application.  *See* 20 C.F.R. § 416.963(e).  (Tr. 27).  Although Plaintiff has a high school education, 20 C.F.R. § 416.964(b)(4); (Tr. 7 at ¶9), she attended special education classes.  Plaintiff's application alleges disability as of January 1, 1998.  (Tr. 54).

During the administrative hearing on August 10, 2006, Plaintiff testified that she lives with her father and brother in a house owned by her father.  (Tr. 231).  Her ex-husband has custody of their 15-year-old daughter.  (Tr. 230).  She does not drive because "it makes me real nervous."  (Tr. 231).  She denies difficulty reading except as to "big

2

words" (Tr. 232), and likes to read TV Guide, country music magazines and love stories. (Tr. 236).  She also can write, but doesn't often.  (*Id.*).  She has no present source of income (Tr. 231), and never has held a regular job for as long as three months.  (Tr. 232).

Plaintiff identifies "all kinds of medical problems" as the biggest obstacle to her ability to work.  (*Id.*).  She still experiences right foot pain (Tr. 232) despite being fitted for orthotic inserts in both shoes (Tr. 236), and "can't hardly walk on my feet," or can "just walk a few miles" (*id.*), standing or walking up to "5, 15, 20 minutes, maybe."  (Tr. 233).  She also has high blood pressure which causes her to have dizzy spells and lose her balance, sometimes falling down.  (Tr. 232).  She testified that anything beyond five or eight pounds is "too heavy to lift" (Tr. 233), causing pain from her legs and arms.  (Tr. 235-36).  She does do some household chores, including laundry, and shares cooking and grocery shopping duties with her brother.  (*Id.*).  She has never been to the grocery store alone, and "I don't think I could do it."  (Tr. 236-37).

Plaintiff said that she has no friends besides her family and has no hobbies.  (*Id.*). She described a typical day as getting up at 9 to 10 a.m., then emptying the dishwasher and reading the paper before getting dressed.  (Tr. 234).  She passes the rest of the day by watching television or working on puzzle books.  (*Id.*).

Although she takes medication for her high blood pressure (Tr. 232, 234), it is "[n]ot really" controlled, leading her to experience headaches for four or five years preceding the hearing.  (Tr. 234-35).  She has discussed her loss of balance and falling episodes with her doctors, but continues to fall up to two or three times a day.  (Tr. 235).

She has some problems telling time, and needs to use a calculator or her fingers for counting.  (Tr. 237).

She does not remember much about her special education classes.  (Tr. 237).  She "got along pretty good" with other students and with teachers, but "a lot of people picked on me."  (Tr. 237-38).

Plaintiff's counsel sought to call Plaintiff's aunt at the administrative hearing, "to testify as to deficits and adaptive functioning prior to age 22, if necessary" (Tr. 229), but the ALJ told counsel that such testimony was unnecessary, as "that's not the issue."  (Tr. 238).

A vocational expert then testified regarding the number of jobs with certain limitations available in the regional economy "at any exertional level" for a hypothetical person with Plaintiff's characteristics.  (Tr. 238-39).  Adding a limitation of standing no more than 15 minutes per hour, the vocational expert reduced his estimate to about 4500 light strength and 2500 sedentary strength jobs, including mail clerk and lens inserter. (Tr. 240).

Although no medical expert testimony was presented at the hearing, Plaintiff submitted exhibits including extensive medical records.  (Tr. 97-217).  The parties have provided detailed and informative descriptions of those medical records and other pertinent evidence.  (*See* Doc. #6 at 3-7; Doc. #7 at 2-5).  In light of this, and upon consideration of the complete administrative record, there is no need to fully reiterate the parties' descriptions.  Still, describing a few medical source opinions will help frame

4

further review.

The evidence most relevant to Plaintiff's claimed mental disability is found in the report of Dr. Giovanni M. Bonds, a clinical psychologist to whom the Ohio Bureau of Disability Determination referred Plaintiff for a psychological evaluation on April 7, 2004. (Tr. 97-103). Dr. Bonds reports that intelligence tests administered to Plaintiff revealed "a verbal IQ score of 65, a Performance IQ score of 64, and a Full Scale IQ score of 62," falling "in the Extremely Low range . . . of intellectual functioning." (Tr. 100). Memory testing yielded "an Immediate Memory Index of 59, a General (Delayed) Memory Index of 64, and a Working Memory Index of 66," also "in the Extremely Low range of memory functioning." (*Id.*). On an additional reading test, Plaintiff scored "an Oral Reading Quotient of 61," below the first percentile; a "2.2 grade equivalent" on Comprehension; an 8.0 grade equivalent on Rate; and a 6.7 grade equivalent on Accuracy. (*Id.*). Given Plaintiff's ability to complete Dr. Bonds' office forms on her own, however, Dr. Bonds surmised that "[t]he reading comprehension score may be an underestimation of her comprehension ability," and that Plaintiff likely has "a reading comprehension level of a least fourth or fifth grade level." (*Id.*).

Based on the overall evaluation of Plaintiff, Dr. Bonds diagnosed her with mild mental retardation, hypertension, thyroid problems, and psycho-social problems: learning disability. (Tr. 101). Dr. Bonds' final assessment of Plaintiff's mental abilities was as follows: "to understand, remember and follow instructions" as "severely limited;" "to withstand the stress and pressure associated with day to day work activities" as

5

"moderately limited;" "to relate to peers, supervisors or the public" as "mildly limited;" to maintain attention, concentration, persistence and pace to perform simple repetitive tasks" as "not significantly limited;" and "to manage her funds" as "sufficient." (Tr. 102).

The record also contains "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment" forms completed by William B. Benninger, Ph.D., and Mel M. Zwissler, Ph.D., in May and July of 2004, respectively. (Tr. 104-119). On the first form, they made a finding of "mild mental retardation" that "does not precisely satisfy the diagnostic criteria" of Listing 12.05. (Tr. 104, 108). Under "rating of Functional Limitations," they found that Plaintiff has no more than a "moderate" degree of limitation as to any of the four listed functional limitations for the Listings "B" criteria. (Tr. 114). They also found that the evidence "does not establish the presence of the 'C' criteria." (Tr. 115).

Their assessment on the second form deemed Plaintiff "markedly limited" in "her ability to understand and remember detailed instructions." (Tr. 117). It also found her to be "moderately limited" in another eight of the twenty enumerated categories. (Tr. 117-18). Drs. Benninger and Zwissler concluded that Plaintiff "would be able to complete simple and routine tasks where changes could be explained and [the] expected pace is not rapid." (Tr. 119).

The final piece of psychological evidence in the record consists of brief treatment notes of another psychologist , Nancy Milam, Ph.D. (*see also* Tr. 81), who apparently saw Plaintiff five times between August 30, 2004 and April 25, 2005. (Tr. 182-84). Dr.

Milam's notes indicate that Plaintiff was referred by her physician, who "advised counseling." (Tr. 184). At the time of Plaintiff's first visit, Dr. Milam diagnosed her with "adjustment disorder with mild anxiety and depressed mood," with a treatment goal of "supportive psychotherapy." (*Id.*). Notes from Plaintiff's December 13, 2004 appointment reflect that "MD doesn't think she qualifies for SSI on health issues." (Tr. 183; *see also* Tr. 140 [doctor's office notation of "Referral for Psychiatrist - for SSI"]). Later notes record Plaintiff's medical concerns and her fear of going to jail for failure to pay child support. (Tr. 182-83).

Medical evidence from physicians includes records relative to treatment of Plaintiff's hypertension, hypothyroidism, plantar fasciitis, excessive daytime sleepiness, dizziness, lightheadedness and falling. (*See* Tr. 120-181, 185-217). (Doc. # 6 at 5-7, Doc. #7 at 3-5).

## III. THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The term "disability" as defined by the Social Security Act carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies.[2] *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

---

[2] Impairments also must be either expected to cause death or last twelve months or longer. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

7

Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* Tr. 18-30; *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

In the present case, the ALJ conducted the appropriate sequential review.  He addressed Step 1 with his finding that "[t]here is no evidence that [Plaintiff] performed substantial gainful activity in the relevant past."  (Tr. 18).  As to Step 2, he found that Plaintiff has the severe impairment of "borderline intellectual functioning" (Tr. 22), but that "[t]here is no substantial evidence of any other physical or mental impairment that is 'severe.'" (Tr. 23).

The ALJ determined at Step 3 that the severity of Plaintiff's mental impairment "does not meet or equal" that for "mental retardation" in Listing 12.05. (*Id.*). He made a Step 4 determination that Plaintiff retains a residual functional capacity "to do work at any defined level of exertion," but "limited by the effects of borderline intellectual functioning which result in 'moderate' limitation in the claimant's ability to maintain concentration, persistence, or pace." (*Id.*). The ALJ thus found that Plaintiff "is restricted to performing only one- or two-step simple tasks of an essentially unskilled nature." (*Id.*). He also noted that Plaintiff "has no past relevant work." (Tr. 25).

At Step 5, considering his other factual conclusions regarding Plaintiff, the ALJ found that thousands of jobs "that would involve only one-or two-step simple tasks of an essentially unskilled nature" exist at all exertional levels in the Dayton, Ohio region. (*Id.*). This assessment, along with the ALJ's other findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for SSI. (Tr. 26).

## IV.  STANDARDS OF JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).

9

It consists of "'more than a scintilla of evidence but less than a preponderance . . .'"
*Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo.*
*See Cutlip v. Sec'y of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994).  The
Court's agreement or disagreement with the ALJ's findings plays no role in the
substantial evidence review, and no significance attaches to contrary evidence in the
record, if other substantial evidence supports the ALJ's findings.  *Rogers*, 486 F.3d at
241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the
ALJ's factual findings are upheld "as long as they are supported by substantial evidence."
*Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

A finding of substantial supporting evidence, however, does not end the judicial
inquiry.  Reviewing the legal criteria applied by the ALJ may result in reversal even if the
record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*,
478 F3d at 746.  This occurs, for example, when the ALJ has failed to follow the
Commissioner's "own regulations and where that error prejudices a claimant on the
merits or deprives the claimant of a substantial right."  *Bowen*, 478 F.3d at 746 (citing in
part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## DISCUSSION

### A.    Plaintiff's Contentions

Plaintiff contends that the ALJ erred in declining to find that Plaintiff meets
Listing 12.05C, given evidence of her low IQ scores, her diagnosis of "mild mental

retardation," and deficits in her adaptive functioning. (Doc. #6 at 11-12). She urges that the ALJ also erred in failing to find that Plaintiff has additional physical impairments that significantly limit her functioning, and in failing to consider those other impairments in combination. (*Id.* at 14-15). Finally, Plaintiff asserts that the ALJ erred in assessing Plaintiff's residual functional capacity, as the evidence allegedly supports more limitations than the sole restriction of "performing only one- or two-step simple tasks" stated by the ALJ . (*Id.* at 15-17).

In opposing remand, the Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff did not satisfy Listing 12.05C, as well as his conclusion that Plaintiff does not have another impairment that imposes significant functional limitations. (Tr. #7 at 8-11). Defendant also urges that the ALJ's residual functional capacity finding "adequately accommodated" the limitations identified by the relevant medical experts. (*Id.* at 11-14). The Commissioner thus requests that the ALJ's decision be affirmed.

### B.    Medical Source Opinions

The Social Security Regulations require ALJs to evaluate every medical opinion of record regardless of its source. *See* 20 C.F.R. § 416.927(d). The treating physician rule provides that a treating physician's opinion is entitled to controlling weight so long as it is (1) well supported by medically acceptable data, and (2) not inconsistent with other substantial evidence of record. 20 C.F.R. § 416.927(d)(2); *see Wilson v. Comm'r of Soc.*

*Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). When these requirements are not met, the treating

physician rule does not apply. *Id.*

　　If the ALJ concludes that a particular treating source's opinion is not entitled to

controlling weight under the rule, the ALJ must continue to evaluate that treating source's

opinion by considering the following additional factors:

1. The length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship;

2. The 'supportability' of the opinion – whether it is supported with relevant evidence and whether it is well explained;

3. The consistency of the opinion with the record as a whole;

4. The specialization, if any, of the treating source; and

5. 'Other factors' brought to the ALJ's attention, including, for example, the treating source's knowledge of the SSI or DIB programs and its evidentiary requirements.

20 C.F.R. § 416.927(d)(2)-(6); *see Wilson*, 378 F.3d at 544. In order to comply with the

Regulations, "a decision denying benefits 'must contain specific reasons for the weight

given to the treating source's medical opinion, supported by the evidence in the record,

and must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* (citing Soc. Sec. Rul. 96-2p, 1996 WL 3741888, at *5 (1996)).

　　As to other medical sources – such as one-time examiners or medical experts who

testify during the administrative hearing – ALJs must weigh their opinions using the same

"relevant factors," including supportability, consistency and specialization. *See* 20 C.F.R.

§ 416.927(d), (f).  The Regulations appear to emphasize this requirement by reiterating it

no fewer than three times.  *See* 20 C.F.R. § 416.927(d) ("we consider all of the following

factors in deciding the weight to give any medical opinion....");  *see* also 20 C.F.R. §

416.927(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §

416.927(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996

WL 374180 at *2 (same).

> C.    <u>Analysis</u>

> <u>Listing 12.05C Finding</u>

Plaintiff first challenges the ALJ's finding that she has a severe impairment of

"borderline intellectual functioning" rather than mental retardation.  (Tr. 22).   As

Defendant readily acknowledges, Drs. Bonds, Benninger and Zwissler all recognized

Plaintiff to be "mildly mentally retarded" (Tr. 101, 108, 119), and Plaintiff's personal

physicians gave the same diagnosis.  (Tr. 129, 140, 200).  (Doc. #7 at 8).  Indeed, on

administrative review, even the Appeals Council "concur[red] that the record reflects . . .

valid IQ scores between 60 and 69, establishing mild mental retardation."  (Tr. 6).  The

ALJ based his finding to the contrary on his subjective perception that "the weight of the

evidence does not support" Dr. Bonds' mild mental retardation diagnosis.  (Tr. 22).  A

review of the same evidence convinces this Court that the ALJ's contrary conclusion in

fact is the one that is not supported by substantial evidence.  The ALJ's finding that

Plaintiff is not mentally retarded clearly is erroneous.

Nevertheless, our determination that the ALJ should have made a Step 2 finding of a severe disability of mild mental retardation does not necessarily negate the ALJ's conclusion that Plaintiff does not have a Listing 12.05C impairment. In order to establish a Listing 12.05 impairment, a claimant with a valid IQ score of 60 through 70 also must have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. Although Plaintiff has satisfied the first half of that equation, substantial evidence supports the ALJ's conclusion that she has failed to satisfy the latter.

Plaintiff identifies "plantar faciitis" as her "most significant physical problem." (Doc. #6 at 13). Medical records from Plaintiff's primary health care provider and from Dr. Stephen A. Weeber, Plaintiff's treating podiatrist, document Plaintiff's complaints of right heel pain beginning in September 2004 (Tr. 127, 181) and additional treatment for that condition from January 2005 to February 2005. (Tr. 179-81). Those records also reflect, however, that Plaintiff "appear[ed] to have recovered from her injury" and reported having "no pain in her right heel" as of her last documented podiatrist visit. (Tr. 179). Her hearing testimony about continued right foot pain (Tr. 232-33, 260) notwithstanding, there is no evidence that Plaintiff sought any medical treatment for plantar faciitis after March 2005, despite her podiatrist's directive at that time "to call if she has three days of increased pain in a row." (Tr. 179). Substantial evidence supported the ALJ's finding that the record evidence "does not establish that this condition persisted

14

for a continuous period of at least 12 months."[3]  (Tr. 20).  Additionally, because Dr.

Weeber's treatment notes comment that Plaintiff "is not to be on her feet anymore than 15

minutes at a time" was offered as an instruction to Plaintiff during the early stages of her

treatment, not as a formal opinion regarding an ongoing limitation on Plaintiff's ability to

stand (*see* Tr. 180), the treating physician rule does not apply to that statement.  It thus

was not erroneous for the ALJ to conclude that "[t]here is no substantial objective

medical evidence to corroborate the necessity for" Plaintiff to have a 15 minute per hour

limitation on standing in any job.  (Tr. 19; *see also* Tr. 20).  For all of the foregoing

reasons, the ALJ did not err in declining to find that Plaintiff's plantar faciitis was "a

physical . . .impairment imposing an additional and significant work-related limitation of

function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

Similar conclusions follow as to Plaintiff's other medical and psychological

complaints.  Medical records indicate that Plaintiff's treating doctors considered both her

hypertension and hypothyroidism to be well controlled by medication prior to the

administrative hearing.  (Tr. 129-30, 132-33, 147, 151, 196-97, 199-200).  The ALJ's

specific finding that Plaintiff's "condition relative to hypertension is stable" (Tr. 19, *see

also* Tr. 25) is supported by substantial evidence and thus not erroneous.

Plaintiff's treating psychologist's initial diagnosis of "adjustment disorder with

mild anxiety and depressed mood" (Tr. 184) was not accompanied by any opinion or

---

[3]"Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.  We call this the duration requirement."  20 C.F.R. § 614.909; *see* n.2, *supra*.

15

other elaboration as to the implications of those psychological conditions on Plaintiff's work–related ability to function. (*See* Tr. 182-84). Plaintiff herself mentioned no psychological symptoms at the time of her hearing testimony, and Dr. Bonds' observations regarding Plaintiff's mood, affect and anxiety (*see* Tr. 98-99) made just four months before Dr. Milam's "adjustment disorder" diagnosis belie the existence of any severe, enduring psychological impediment to Plaintiff's functioning. Additionally, Plaintiff's apparent discontinuation of therapy after less than eight months falls short of proving the requisite duration. *See* n.3, *supra.* For all of these reasons, it was not error for the ALJ to fail to find that Plaintiff's diagnosed psychological conditions constituted an impairment which "impos[es] an additional and significant work-related limitation of function," for purposes of Listing 12.05C – indeed, under these circumstances, it was not error for the ALJ to fail to address Dr. Milam's diagnosis at <u>all</u> in his Listing 12.05 analysis.

As the ALJ implied by referring to Plaintiff's negative cardiac testing in May 2005 (*see* Tr. 19), no objective medical evidence substantiates Plaintiff's persistent complaints of dizziness and falling. (*See* Tr. 206-11). The ALJ specifically found Plaintiff's allegations in this regard "to be disproportionate and less than credible" (Tr. 25), a finding entitled to deference. The record also reflects no medical treatment sought for that condition after October 2005. (*See* Tr. 194). Absent any evidence from any expert medical source suggesting that those subjective symptoms imposed "an additional and significant work-related limitation of function," the ALJ did not err by refusing to find

16

that Plaintiff's complaints of dizziness and falling established a Listing 12.05C impairment.

Because the ALJ appropriately concluded that none of Plaintiff's alleged conditions constituted an impairment for purposes of Listing 12.05 analysis, he also did not err in failing to address all of Plaintiff's alleged conditions in combination.  Plaintiff's allegations of errors as the ALJ's finding of no Listing 12.05C impairment therefore are not well taken.

<u>Residual Functional Capacity Finding</u>

Irrespective of the outcome on the Listing 12.05C issue, Plaintiff further argues that the ALJ erred in his residual functional capacity finding that the only limitation on Plaintiff's ability to work is a restriction "to performing essentially unskilled one- or two-step simple tasks."  (Tr. 27 at ¶6).  She urges that such limitation seemingly disregards Dr. Bonds' findings that Plaintiff is "severely limited" in her ability "to understand, remember and follow instructions" (Tr. 102 at ¶2), and "moderately limited" in her ability "to withstand the stress and pressure associated with day to day work activities."  (*Id*. at ¶4).  She further urges that the ALJ ignored Drs. Benninger's and Zwissler's additional summary conclusions[4] that Plaintiff's abilities are "moderately limited" in the following areas:

> to maintain attention and concentration for extended periods;

---

[4]Essentially echoing Dr. Bonds' findings, the state agency psychologists also found Plaintiff to be "markedly limited" in her ability "to understand and remember" as well as to "carry out" detailed instructions.  (Tr. 117).

>to perform activities within a schedule, maintain regular
>attendance, and be punctual within customary tolerances;
>
>to complete a normal workday and workweek without
>interruptions from psychologically based symptoms and to
>perform at a consistent pace without an unreasonable number
>and length of rest periods;
>
>to accept instructions and respond appropriately to criticism
>from supervisors;
>
>to get along with coworkers or pers without distracting them
>or exhibiting behavioral extremes;
>
>to respond appropriately to changes in the work setting;
>
>to travel to unfamiliar places or use public transportation; and
>to set realistic goals or make plans independently of others.

(Tr. 117-18), as well as their conclusion that Plaintiff "would be able to complete simple

and routine tasks where changes could be explained and expected pace is not rapid."  (Tr.

119).

In response, the Commissioner argues that the Section I checklist on the state

agency psychologists' "Mental Residual Functional Capacity Assessment" form (Tr. 117-

18) "was not a RFC finding," but "merely a worksheet to aid in deciding the presence and

degree of functional limitations and the adequacy of documentation."  (Doc. #7 at 12)

(citing Program Operations Manual System DI 24510.060B2).  As such, Defendant

contends that the ALJ was not obliged to consider that checklist's "moderately limited"

findings, but only the actual "Functional Capacity Assessment" found in Section III of

that form, to the effect that Plaintiff "would be able to complete simple and routine tasks

18

where changes could be explained and expected pace is not rapid." (Tr. 119). (Doc. #7, p. 12). The Commissioner asserts that the ALJ's residual functional capacity finding that Plaintiff "is restricted to performing essentially unskilled one- or two-step simple tasks" (Tr. 27 at ¶6) "adequately accommodated" Dr. Bonds' aforesaid concerns and "proved substantial[ly] consistent with" the state agency psychologists' aforesaid opinions relative to Plaintiff's residual functional capacity. (Doc. # 7 at 12).

Even without considering the state psychologists' "moderately limited" checklist at Tr. 117-18, however, a careful review of the psychologists' opinions regarding Plaintiff's work-related abilities does not bear out the Commissioner's claim that the ALJ's residual functional capacity finding sufficiently addresses them. Assuming *arguendo*, as to Dr. Bonds' opinions, that Plaintiff's "severely limited" ability "to understand, remember and follow instructions" (Tr. 102 at ¶2) is adequately accommodated by the ALJ's restriction to "essentially unskilled one- or two-step simple tasks" (Tr. 27 at ¶6), there remains no reasoned explanation as to how restricting Plaintiff to repetitive tasks accommodates her "moderately limited" ability "to withstand the stress and pressure associated with day to day work activities." (Tr. 102 at ¶4). Additionally, while the ALJ's stated residual functional capacity restriction arguably satisfies the state psychologists' concern that Plaintiff be limited to "simple and routine tasks" (Tr. 119), the Commissioner has not convinced this Court that the ALJ's sole restriction also assures that Plaintiff would be considered capable of working only in a setting where "changes could be explained" and where the "expected pace is not rapid." (Tr. 119).

19

Moreover, both Plaintiff and the Commissioner completely overlook two other important reservations set forth by the state agency psychologists in their Section III "functional capacity assessment:" that Plaintiff "is capable of interaction with others on a superficial basis where there are **no more than brief demands for social conversation**," and that Plaintiff "would **not** be able to handle a work setting in which **frequent supervisory interaction/feedback** was required."  (Tr. 119) (emphasis added).  Nothing in the record suggests that the ALJ considered the state agency psychologists' opinions to that effect in formulating a residual functional capacity for Plaintiff, nor does the Commissioner explain how Plaintiff's opined inability to handle more than "superficial" interaction or supervisory interaction and feedback can be reconciled with her unanimously accepted inability to "to understand, remember and follow instructions." (Tr. 102 at ¶2; Tr. 117).  The ALJ's residual functional capacity finding thus is not supported by substantial evidence, and Plaintiff's Statement of Errors is well taken as to the residual functional capacity issue.

In light of our finding that the ALJ's Step 4 determination regarding Plaintiff's residual functional capacity was erroneous due to his failure to address fully the opinions of Drs. Bonds, Benninger and Zwissler, Step 5 of the ALJ's analysis likewise was fatally flawed.  The hypothetical on which the vocational expert based his opinion regarding available jobs in the regional economy did not take into consideration additional limitations on Plaintiff's work-related abilities that might have been imposed had the ALJ

incorporated all the relevant expert opinions into his residual functional capacity assessment.  (Tr. 238-40).  For that reason, the ALJ's ultimate conclusion that Plaintiff "was not 'disabled'" for purposes of the Social Security Act (Tr. 27) cannot be affirmed.

## V.     REMAND IS WARRANTED

If an ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See id*.  Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g), due to the errors outlined above.  On remand, the ALJ should be directed (1) to re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) to reconsider,

under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for SSI.  Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's residual functional capacity finding be vacated;

2.      No finding be made as to whether Plaintiff Wanda Martin was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.

August 7, 2008                                       s/ Sharon L. Ovington
                                                       Sharon L. Ovington
                                                 United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).